IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

WENDY HEMMINGSEN,           )
                           )
            Plaintiff,      )
                           )
      v.                    )  Case No.
                           )  06-0746-CV-W-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,         )
                           )
            Defendant.      )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Wendy Hemmingsen seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Titles II
and XVI of the Social Security Act ("the Act"). Plaintiff argues
that (1) the ALJ erred in finding plaintiff not credible, and (2)
the vocational expert's testimony is not supported by the record.
I find that the substantial evidence in the record as a whole
supports the ALJ's finding that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be denied
and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On October 21, 2003, plaintiff applied for disability
benefits alleging that she had been disabled since August 15,
2002. Plaintiff's disability stems from fatigue, depression,
anxiety, headaches, difficulties with concentration, and carpal
tunnel syndrome. Plaintiff's application was denied on January

15, 2004.  On February 22, 2006, a hearing was held before an Administrative Law Judge.  On March 24, 2006, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On July 7, 2006, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts

2

<u>v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v.</u>
<u>Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It
means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." <u>Richardson v. Perales</u>, 402
U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991). However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts. "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
<u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of
proving she is unable to return to past relevant work by reason
of a medically-determinable physical or mental impairment which
has lasted or can be expected to last for a continuous period of
not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the
plaintiff establishes that she is unable to return to past
relevant work because of the disability, the burden of persuasion
shifts to the Commissioner to establish that there is some other
type of substantial gainful activity in the national economy that
the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857

3

(8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u>  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

Case 4:06-cv-00746-REL   Document 15   Filed 06/15/07   Page 4 of 47

5. Does the impairment prevent the claimant from doing any other work?

>               Yes = disabled.
>               No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1983 through 2002:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1983 | $ 1,603.00 | 1993 | $ 4,861.76 |
| 1984 | 1,455.63 | 1994 | 16,181.96 |
| 1985 | 4,602.77 | 1995 | 12,203.75 |
| 1986 | 7,678.11 | 1996 | 17,706.00 |
| 1987 | 10,112.01 | 1997 | 17,661.62 |
| 1988 | 15,587.25 | 1998 | 20,333.04 |
| 1989 | 13,249.54 | 1999 | 19,858.84 |
| 1990 | 12,621.50 | 2000 | 19,658.43 |
| 1991 | 13,962.39 | 2001 | 15,893.85 |
| 1992 | 11,116.01 | 2002 | 8,231.72 |

(Tr. at 45).

5

**Disability Report - Adult**

In a Disability Report completed by plaintiff, she stated that her illnesses, injuries or conditions that limit her ability to work are "EBV - Epstein Barr Virus, Depression" (Tr. at 47). Plaintiff stated that when she is stressed, her mind shuts down. Her symptoms caused her work performance to get so bad that she was forced to quit her full time job at Northland OBGYN to take a part time job. She was let go from that job less than 90 days after she started, with no explanation.

**Disability Report - Field Office**

On October 29, 2003, A. Wilson, an interviewer with Disability Determinations, met face to face with plaintiff and observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing (Tr. at 64).

**Claimant Questionnaire**

In a Claimant Questionnaire completed by plaintiff on November 12, 2003, she reported that she has two children, ages six and four, who need a lot of help (Tr. at 76). Plaintiff gets them dressed, gives them baths, brushes their teeth, fixes their meals, cleans the house, helps them with homework and with home school projects, does laundry, does dishes, and puts her kids to

bed.  Plaintiff reported that she is able to pay bills, use a checkbook, complete a money order, and count change.  She is able to do laundry, do dishes, make beds, change sheets, iron, vacuum, sweep, take out the trash, and go to the post office (Tr. at 77).

Plaintiff reported that she has frequent anxiety attacks. She has no problem going to sleep and staying asleep, and she often takes naps during the day, yet she never feels rested.

Plaintiff listed her hobbies as watching television, reading, checking her e-mail, talking on the phone, reading stories to her children, helping her kids with homework, and doing crafts.  Plaintiff reported she takes her six-year-old to school every morning, then sleeps until around 10:00 while her four-year-old plays by herself.  She then takes her younger daughter to her parents' house to stay while plaintiff runs errands.  She picks her kids up in the afternoon and takes care of them in the evenings.  Plaintiff plays games or uses her computer for ten to 30 minutes per day.  She has a valid driver's license and is able to drive daily.  She is out of her home about 30 minutes to three hours every day.  She is able to drive an unfamiliar route.

**Claimant Questionnaire Supplement**

On November 12, 2003, plaintiff completed a Claimant Questionnaire Supplement wherein she reported that sitting is no

problem, she can stand for 15 to 30 minutes and then her legs
become rubbery and weak, she can walk for 15 to 30 minutes (Tr.
at 74).  Plaintiff reported that standing, walking, and lifting
sometimes cause anxiety attacks.  She reported she can use her
hands for 15 to 30 minutes, and then her arms and shoulders feel
weak and shaky.  Bending is no problem as long as it is not
repetitive, same with kneeling and squatting.  Climbing stairs
often causes anxiety attacks.  Plaintiff can reach forward and
backward, and she can work or reach overhead without a problem as
long as those tasks are not repetitive.

**B.**  **_SUMMARY OF MEDICAL RECORDS_**

Plaintiff's alleged onset date is August 15, 2002.  The
first medical record in the file is dated October 7, 2002.  On
that day, plaintiff was seen at Truman Medical Center and an
intake assessment summary was prepared (Tr. at 133-135).

> The ct [client] reported a complicated family picture that I
> may or may not have the details correct for.  She married in
> 1991 and separated from her ex in 2001.  She has been
> married 3 times and divorced twice.  She is now married
> again, but stated that she got a divorce from the ex 2 weeks
> ago.  Her ex that she was with for 10 years used drugs and
> suffered from "manic depression."  She said during that time
> she had mood swings that included mania and depression,
> though the exact nature and hx [history] of this is unclear.
> She indicated her moods "spiraled down after I got out of a
> bad marriage."  She indicated her current husband is
> supportive.  I am thus not giving the ct [client] a Bipolar
> or "MDD [major depressive disorder] Recurrent" dx
> [diagnosis].

8

The ct is dx with MDD, Moderate Type.  Her reports that
passive suicidal thoughts and inability to maintain
employment lead me to that dx.  Her depressive symptoms
include lethargia [sic], "constant fatigue", poor sleep,
poor concentration, inability to remember conversations,
feeling too tired to do things with her children
irritability with her husband and children.

Plaintiff was described as bright and fairly articulate, and

the social worker ranked her as a good counseling candidate.  Her

primary diagnosis was Major Depressive Disorder, Single Episode,

Moderate.  She was noted as having moderate problems with her

family, daily living skills, and economic problems; and severe

occupational problems.  Her current GAF was 64[1], highest GAF in

the last year was 77[2].

On October 9, 2002, plaintiff was referred to Truman Medical

Center Behavioral Health (Tr. at 127-132).  She stated that she

had some passive suicidal thoughts but it was more literally "to

run away" from her family and child raising responsibilities.

Her previous psychiatric history included only two prescriptions

---

[1]A Global Assessment of Functioning of 61 to 70 means mild
symptoms (e.g., depressed mood and mild insomnia) or some
difficulty in social, occupational, or school functioning (e.g.,
occasional truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal
relationships.

[2]A GAF of 71 to 80 means that if symptoms are present, they
are transient and expectable reactions to psychosocial stressors
(e.g., difficulty concentrating after family argument), no more
than slight impairment in social, occupational, or school
functioning (e.g., temporarily falling behind in schoolwork).

Case 4:06-cv-00746-REL   Document 15   Filed 06/15/07   Page 9 of 47

from her primary care physician within the last year, Zoloft[3] and Paxil[4]. Under risk assessment, the "no" box is checked next to "Chronic physical illness/pain". Plaintiff reported frequent dizziness and fatigue, and rated her headaches and back pain as a "4 to a 6 to an 8." The mental status checklist shows that plaintiff was observed to have normal speech, her thought processes were intact, her judgment was intact, her attitude was cooperative, there was no disturbance of her thought content, her motor activity was normal, her mood was normal, her insight was good, her alertness was good, her affect was appropriate, her intellect was above average, and her memory was intact. The following recommendation was made: "Counseling to decrease emotional reactivity to others and to return to employment".

There are no medical records from October 9, 2002, through October 9, 2003.

On October 9, 2003, plaintiff was seen at the Cameron Medical Center for a refill of birth control pills (Tr. at 140-146). Plaintiff reported that she suffered from chronic fatigue, it was getting worse, she had no energy, and she had stopped

---

[3]Zoloft is in a class of drugs called selective serotonin reuptake inhibitors. Zoloft affects chemicals in the brain that may become unbalanced and cause depression, panic or anxiety, obsessive or compulsive symptoms, or other psychiatric symptoms.

[4]Paxil is a selective serotonin reuptake inhibitor. See footnote 3.

10

taking Elavil and her symptoms became worse.  Plaintiff reported

three to four tension headaches per week, but those headaches

were relieved by Excedrin Migraine and caffeine.  A physical exam

was performed, and everything was marked "normal", including

judgment, insight, orientation, mood, affect, recent memory, and

remote memory.  Plaintiff had lab work done, and everything was

normal except her white blood cell count which was 3.9 (normal is

4.0 to 10.5), and she had a positive result indicating she could

have Epstein Barr virus[5].  She was assessed with chronic fatigue

---

[5]According to the Center for Disease Control, Epstein-Barr
virus, frequently referred to as EBV, is a member of the herpes
virus family and one of the most common human viruses. The virus
occurs worldwide, and most people become infected with EBV
sometime during their lives. In the United States, as many as 95%
of adults between 35 and 40 years of age have been infected.
When infection with EBV occurs during adolescence or young
adulthood, it causes infectious mononucleosis 35% to 50% of the
time.  Symptoms of infectious mononucleosis are fever, sore
throat, and swollen lymph glands. Sometimes, a swollen spleen or
liver involvement may develop. Heart problems or involvement of
the central nervous system occurs only rarely, and infectious
mononucleosis is almost never fatal. Although the symptoms of
infectious mononucleosis usually resolve in 1 or 2 months, EBV
remains dormant or latent in a few cells in the throat and blood
for the rest of the person's life. Periodically, the virus can
reactivate and is commonly found in the saliva of infected
persons.  This reactivation usually occurs without symptoms of
illness.  It is important to note that symptoms related to
infectious mononucleosis caused by EBV infection seldom last for
more than four months. When such an illness lasts more than six
months, it is frequently called chronic EBV infection. However,
valid laboratory evidence for continued active EBV infection is
seldom found in these patients. The illness should be
investigated further to determine if it meets the criteria for
chronic fatigue syndrome, or CFS. This process includes ruling
out other causes of chronic illness or fatigue.

Case 4:06-cv-00746-REL   Document 15   Filed 06/15/07   Page 11 of 47

and depression. She was prescribed Elavil[6], over-the-counter iron supplements, and over-the-counter Excedrin Migraine as needed.

On October 21, 2003, plaintiff filed her application for disability benefits.

On October 28, 2003, plaintiff was seen at the Cameron Medical Clinic after she smashed her finger between two grocery carts (Tr. at 138). Plaintiff reported that she was taking no medications at the time. Plaintiff had cleaned her finger and applied a band aid. No treatment was provided at the clinic. The bottom of the form contains the following statement: "Discussed about length re: applying for disability".

On December 2, 2003, plaintiff was seen at the Cameron Regional Medical Center by a nurse practitioner for arthritis (Tr. at 193). Plaintiff's physical exam was normal; however, the sections for psychological symptoms and musculoskeletal symptoms are blank. She was assessed with arthritis and told to take Motrin. The bottom of the form contains the following hand-written statement: "Note may donate plasma, no murmur heard".

On December 8, 2003, a DDS physician completed a Physical Residual Functional Capacity Assessment (Tr. at 173-180). The

_____

[6]Elavil, also known as Amitriptyline, is an antidepressant.

12

doctor found that plaintiff can lift 20 pounds occasionally and ten pounds frequently; can stand and/or walk for about six hours per day; can sit for about six hours per day; and has an unlimited ability to push or pull. She found that plaintiff can occasionally climb, balance, stoop, kneel, crouch, or crawl. She found no manipulative limitations (such as reaching and handling), no visual limitations, and no communicative limitations. She found that plaintiff should avoid concentrated exposure to extreme cold or heat, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. In support of her findings, the doctor noted plaintiff's allegation of trouble with fatigue. Plaintiff claimed Epstein Barr virus but the doctor noted no clear medical records to support that diagnosis. The doctor noted that plaintiff does chores, drives, takes care of her two kids, ages four and six. Finally, the doctor noted that plaintiff's depression, which has been diagnosed, could cause fatigue.

On December 17, 2003, plaintiff was seen in the emergency room after she cut herself with a butcher knife while cooking (Tr. at 199). Plaintiff was treated and released.

On January 7, 2004, plaintiff saw John Keough, M.A., a licensed psychologist (Tr. at 151-153).

Presenting Problems per Client Report: Ms. Hemmingsen
stated that she is extremely tired all the time, easily

13

confused, unable to concentrate at times, has occasional
disorientation, is easily distracted, has many projects
going but seldom completed, and short-term memory problems.
The client indicated that she does not take anything in or
process it.  She reports being very irritable and short-
tempered.  Ms. Hemmingsen stated that she has anxiety with
panic like symptoms.  The client reports experiencing
depression at a level of 7 on a scale of 1 to 10 not to
include suicidal ideation, but having absolutely no
motivation, often feels negative, and very hopeless at
times.  She stated that she sleeps a lot, but never more
than 4 or 5 hours at a time and she is up and down all day
and all night, and she continues to be exhausted. . . . The
client's current medication regimen prescribed by Dr.
Erickson, M.D., and Dr. Richardson, M.D., includes:
     Ibuprofen, 800 mg. PRN [as needed]
     Amitriplyline[7] [sic], 100 mg. HS [at bedtime]
     Amitriplyline [sic], 25 mg. HS [at bedtime]
     Trivora [birth control pill], 28 mg. PRN [as needed]
     Zanax[8] [sic], 1 mg. PRN [as needed]
     Melatononen[9] [sic] daily

<u>Client History</u>:  Ms. Hemmingsen reports first receiving
mental health treatment within the past year, to include
therapy and medications.  She stated that she was involved
in family and individual therapy for 10 months.  The client
reports no therapy since September 2003 because she can't
afford it. . . .

. . . Ms. Hemmingsen stated that she has been married two
times.  The first marriage began at age 30 and ended in
divorce 9 years later, with two children born and she has
custody of her children.  The second marriage began at age
41 and she has been separated since December, 2002.  Ms.
Hemmingsen stated that she has no children by this marriage.

---

[7]I assume Mr. Keough meant Amitriptyline, which is an
antidepressant, also known as Elavil.  It is unclear why this
drug was listed twice with two different doses, both being taken
at bedtime.

[8]I assume Mr. Keough meant Xanax.  Xanax treats anxiety.

[9]I assume Mr. Keogh meant Melatonin, which is an herb used
to treat insomnia.

14

She stated that her household consists of herself and her 2 daughters.

Socially, the client stated that all she does is go to church on a weekly basis and is occasionally involved with church activities. Her hobby is watching movies on TV and she tries to read. . . .

<u>Mental Status Examination</u>. . . . Ms. Hemmingsen appeared to have no difficulty interacting with the consultant. She appeared to be experiencing a mild to moderate level of anxiety and depression. The client's affective responses were appropriate; speech was clear, logical, and coherent. . .

Ms. Hemmingsen's general memory appears to be complicated by anxiety and she had some difficulty remembering things, but did so generally in an adequate manner. She had no difficulty in recalling three items identified 10 minutes earlier. The client repeated five digits forward, three digits backward, counted upward by three's from one to forty in 33 seconds error free, and she recited the alphabet in 5 seconds error free.

The client's social judgment skills were adequate, as she responded correctly to five of the six questions of social judgment nature. Ms. Hemmingsen appears to have some insight into her problems, indications are she does not project blame for her shortcomings on others. The client's quality of thinking was adequate, as she identified the four proverbs presented to her. Ms. Hemmingsen's abstract conceptual thinking was adequate, as she correctly related to five of the six abstractions. Intellectually, the client appears to be functioning in the Low Average Range of ability. She identified the current United States President and four former presidents since 1950. The client did not know the number of weeks in a year. . . .

Daily activities, reported by the client, include rising at 6:30 AM and getting her daughter off to school, returning to bed till noon, doing dishes, laundry, and cleaning house for 30 minutes, napping for an hour, up and at it again for 30 minutes, back and forth with her best time being in the evening. She stated that she retires by 10:00 PM. Ms. Hemmingsen reports no changes in interests or habits over the past year. When asked what restricts her most, the

15

client replied, "A total lack of energy." Ms. Hemmingsen
stated that so far she can still manage money.

Based upon my findings during this interview and records
reviewed, indications are that the client's ability to
understand and remember instructions is mildly to moderately
limited by a mood disorder and anxiety. Ms. Hemmingsen's
ability to sustain concentration, persistence in tasks, and
maintain and adequate pace in productive activity on a
sustained basis necessary to be gainfully employed and self-
sustaining appears to be moderately limited by a mood
disorder and anxiety. The client's ability to adapt to the
environment of others appears to be mildly to moderately
limited by the above-mentioned symptoms. Indications are
the client is able to manage funds in her best interests.

Diagnostic Impression
Axis I:   Mood Disorder NOS [not otherwise specified]

(Tr. at 151-153).

On January 15, 2004, J. Scott Morrison, M.D., completed a

Psychiatric Review Technique (Tr. at 155-168). Dr. Morrison

found that plaintiff suffers from affective disorders

(depression) and anxiety-related disorders (anxiety not otherwise

specified) resulting in mild restrictions of activities of daily

living; mild difficulties in maintaining social functioning; and

moderate difficulties in concentration, persistence, or pace.

That same day, Dr. Morrison completed a Mental Residual

Functional Capacity Assessment finding that plaintiff is not

significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple
  instructions

16

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to set realistic goals or make plans independently of others

He found plaintiff moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to respond appropriately to changes in the work setting

Finally, he found that plaintiff's ability to travel in unfamiliar places or use public transportation was not ratable on the available evidence (Tr. at 169-170).

In support of these findings, Dr. Morrison wrote the following:

> 41 year old woman who alleges Epstein-Barr virus and depression. The MERs do not appear to support the EBV allegation, but depression is fully credible. She apparently worked until 11/03. ADLs [activities of daily living] include being a single parent taking care of two children, 4 & 6, doing all the household chores including laundry, dishes, cooking, making beds, ironing, sweeping, taking out the trash. She attends church regularly, drives regularly. She sought psych care in 2002 in the context of her third marriage breaking up but is no longer in therapy. She is currently on a low to moderate dosage of amitriptyline, which may be contributing to her complaint of fatigue. She is not currently in psych treatment per se. She was seen in Psych CE [consultative exam] by John Keough M.A. Her MSE [mental status exam] is fairly normal except for occasional difficulty with remote memory. But she was able to remember 3 of 3 items after ten minutes, repeat 5 digits forward, 3 backward. She was mildly depressed and anxious. Mr. Keough indicates she would have mild-moderate impairment regarding understanding and carrying out instructions, moderate difficulty with persistence and concentration, mild-moderate difficulty adapting to a work-like environment. Given these data it is reasonable to conclude that she would be capable of performing adequately in a low-stress work-like situation.

(Tr. at 169-171).

18

On January 15, 2004, plaintiff's application for disability benefits was denied.

On January 21, 2004, plaintiff was seen at the Cameron Regional Medical Center by a nurse practitioner due to chest discomfort, shortness of breath, and palpitations (Tr. at 191-192, 200-201). Her physical exam was all normal; however, the portion of the form regarding psychological symptoms is blank. Plaintiff wore a Holter monitor for 24 hours. The interpretation was negative for complex arrhythmias [abnormal heart rhythms] or pauses, but there were frequent PVCs[10] and rare PACs[11].

On February 26, 2004, plaintiff was seen at Cameron Regional Medical Center by a nurse practitioner due to a cough (Tr. at 190). Her physical exam was all normal. The form includes a section on psychological symptoms, including anxiety; however, that section has been left blank. Plaintiff was assessed with chronic fatigue syndrome and anxiety. She was prescribed BuSpar, which treats anxiety. The bottom of the form includes this hand-

---

[10]Premature Ventricular Contraction - a form of irregular heartbeat in which the ventricle contracts prematurely. This results in a "skipped beat" followed by a stronger beat.

[11]Premature Atrial, Auricular Contraction - a type of premature heart beat which starts in the upper two chambers of the heart, also called atria. These aren't serious, and they frequently go away on their own. Some cells in the heart start to fire or go off before the normal heart beat is supposed to occur. Sometimes people who have them feel a skipped beat. In many cases, the person feels nothing.

written statement: "Pamela Black - letter - unable to work CFS for unknown period of time." Plaintiff was not working at this time, as she last worked sometime in 2003.

On March 3, 2004, plaintiff was seen by Christine Keesling, M.D., who performed an ultrasound of plaintiff's gallbladder (Tr. at 188, 203). The gallbladder was completely filled with stones.

On March 25, 2004, plaintiff requested a hearing before an Administrative Law Judge.

On April 6, 2004, plaintiff was seen at the Cameron Regional Medical Center for nausea, pressure, and shortness of breath (Tr. at 185). Her physical exam, including her extremities, was normal. Plaintiff was diagnosed with gall stones.

On April 7, 2004, plaintiff had chest x-rays taken prior to gallbladder surgery (Tr. at 182). Her heart and lungs were normal.

On April 13, 2004, plaintiff had her gallbladder removed at Cameron Regional Medical Center (Tr. at 204-205, 208). She remained in the hospital for 24 hours and then was released. Dr. Schmidt told plaintiff not to do any lifting or heavy work until she is seen in the office next week.

There are no medical records for the next six months.

On October 15, 2004, plaintiff was seen by a medical provider whose signature is completely illegible (Tr. at 196).

She complained of fatigue, joint pain, headaches, carpal tunnel syndrome, and back pain. The impression is listed as follows:

1) Chronic fatigue [illegible]
2) CTS L>R [carpal tunnel syndrome, left greater than right]
3) arthralgia [illegible]
4) LBP [lower back pain]
5) fibromyalgia syndrome.

The doctor prescribed Flexeril, a muscle relaxer.

On December 8, 2004, plaintiff saw Kala Danushkodi, M.D., due to bilateral hand numbness (Tr. at 194-195). Plaintiff had normal strength, but an inconsistent sensory exam. Dr. Danushkodi's impression was electrodiagnostic evidence of bilateral median entrapment neuropathy at the wrist. "The changes are consistent with severe right and mild left carpal tunnel syndrome."

On April 23, 2005, plaintiff saw Elisa Vinyard, D.O., for a follow up on fatigue and "needs papers filled out" (Tr. at 220). She reported that her carpal tunnel syndrome was worse, but that she had never had the surgery. Dr. Vinyard assessed chronic fatigue and carpal tunnel syndrome. She recommended plaintiff see a rheumatologist.

On April 29, 2005, plaintiff saw Elisa Vinyard, D.O., for an evaluation of her anxiety (Tr. at 230). Dr. Vinyard assessed depression, anxiety, and fatigue, and told plaintiff to eat three times a day.

Case 4:06-cv-00746-REL   Document 15   Filed 06/15/07   Page 21 of 47

On May 4, 2005, Elisa Vinyard, D.O., wrote a letter to plaintiff's attorney. The letter reads as follows: "This letter is in regards to my patient, Mrs. Wendy Hemmingsen. Mrs. Hemmingsen is unable to work until a surgeon sees her for her carpal tunnel syndrome. Due to her insurance (MC+) it has been difficult to schedule this appointment. As a family physician, I will not do a disability determination for her chronic fatigue."

On June 3, 2005, plaintiff saw Elisa Vinyard, D.O. (Tr. at 221). Plaintiff complained of severe joint and muscle pain. She said the Motrin was taking the edge off, but it was not getting rid of the pain. Plaintiff reported headaches every day, turning into a migraine once a month. she reported falling due to dizziness and mood swings. Dr. Vinyard assessed migraines, joint pain, and mood swings. She prescribed Topamax [used to prevent migraine headaches], Imitrex [treats headaches], Cataflam [a non-steroidal anti-inflammatory], and some other illegible medication.

On June 24, 2005, plaintiff saw Elisa Vinyard, D.O. (Tr. at 226). Plaintiff reported that her dizziness was no better, she felt like she would pass out or faint. Dr. Vinyard questioned whether temporal bone dysfunction was causing plaintiff's dizziness.

22

On August 3, 2005, plaintiff saw Elisa Vinyard, D.O. (Tr. at 227). Plaintiff complained of daily headaches, migraines twice a week. Dr. Vinyard assessed migraines and told plaintiff to continue on Topamax and she increased plaintiff's Elavil dosage.

On August 6, 2005, plaintiff saw Elisa Vinyard, D.O. (Tr. at 228). She stated that her fatigue was getting much worse, her headaches were worse, and her memory problems were much worse. Dr. Vinyard recommended a neurology consult.

On September 12, 2005, plaintiff saw Elisa Vinyard, D.O. (Tr. at 229). She stated that her fatigue was the same, she had not refilled her Lexapro[12] for a couple of months, her memory and dizziness were getting worse. Dr. Vinyard assessed anxiety and told plaintiff to refill her Lexapro.

On November 21, 2005, plaintiff saw Elisa Vinyard, D.O. (Tr. at 234). Plaintiff stated that she was losing hope, she had more anxiety, severe memory loss, severe joint and muscle pain, she is constantly moving in bed, she has restless leg syndrome, and she is unable to pick up her feet. Circled next to all of these complaints are the words "reviewed & agreed". Dr. Vinyard assessed anxiety, depression and restless leg syndrome. Dr. Vinyard provided "reassurance", told plaintiff to stop taking

---

[12]Lexapro treats depression and anxiety.

23

Topamax, and to start taking Neurontin[13].  She told plaintiff to continue taking Xanax and Lexapro.

On November 28, 2005, plaintiff called Dr. Vinyard's office and requested a prescription for head lice (Tr. at 235). Plaintiff stated that she "cleans and sprays her whole house", but her kids keep getting lice.

On December 9, 2005, plaintiff was seen by James Mays, M.D., at Wright Memorial Hospital complaining of dizzy spells which come and go but which may last all day, headaches, and poor memory (Tr. at 213).  Plaintiff reported that the symptoms started about four years earlier after a bad marriage ended. Plaintiff reported daily headaches for the past four to five years, and said that two to three times a week those turn into migraines.  "In addition to the dizziness and the headaches, she feels that her personality has changed and that her memory is quite poor."

On exam, Dr. Mays found that plaintiff as able to repeat five digits but not six.  She could recall two of three words at six minutes.  She could repeat the no ifs, ands, or buts about it phrase correctly.  She named 18 animals in one minute.  She

_____

[13]Neurontin affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain. The exact way that it works is unknown. Neurontin is used with other drugs in the treatment of some types of seizures and for the management of nerve pain caused by the herpes virus or shingles.

correctly performed the Luria 3-step sequence of hand movements[14] on the first try.  Plaintiff had normal tone and strength in her extremities.  Fine movements of the hands and finger-to-nose movements with within normal limits.

Dr. Mays recommended a brain MRI.  "If her scan is completely normal and all blood work is within normal limits, it would seem most likely that the headaches and dizziness might be due to a chronic migraine problem.  The memory problems may be due to inattention related to her frequent headaches, depression, medications, and other contributing factors."

On December 12, 2005, plaintiff had an MRI of her head due to headaches (Tr. at 212).  Dr. Staab found a 1 cm mass consistent with a small hemangioma (buildup of blood vessels).

On January 20, 2006, plaintiff was seen by Elisa Vinyard, D.O. (Tr. at 219).  Plaintiff needed refills of her medications, and she wanted to talk about Xanax, chronic fatigue, and depression.  Plaintiff complained that she was unable to get out of bed at times and she was crying a lot, feeling hopeless.  Dr. Vinyard assessed chronic fatigue and depression and she refilled plaintiff's medications.

---

[14]Luria's 3-step motor program is a sequential performance of three movements, which are usually making a fist, laying the palm of the hand down on the table, and laying the hand on edge (fist-palm-edge test).  This is a test to help detect a frontal lobe syndrome.

*C.    SUMMARY OF TESTIMONY*

During the February 22, 2006, hearing, plaintiff testified; and Janice Hastert, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

Plaintiff testified that at the time of the administrative hearing she was 44 years of age (Tr. at 253).  Plaintiff is married and has two children, ages eight and six (Tr. at 254-255).  She has a high school education and two years of college (Tr. at 253).  Plaintiff last worked in 2003 performing house cleaning for Sister Sister Honey Do Cleaning Services (Tr. at 80, 253-254).  Plaintiff testified that she was let go because she could not keep up with the work (Tr. at 254).  Plaintiff worked for this cleaning company for two or three months (Tr. at 254).  She has continued to look for work, but it is difficult for her to find even a part-time job that she is capable of doing with her energy level (Tr. at 254).

Plaintiff's biggest problem is her fatigue and lack of concentration (Tr. at 254).  She gets tired easily, her memory is bad, and she gets frequent headaches and dizziness (Tr. at 254).

Plaintiff is treated by Dr. Vineyard for fatigue, fibromyalgia, headaches, panic attacks, anxiety attacks, and carpal tunnel syndrome (Tr. at 255).  She was diagnosed with

26

carpal tunnel syndrome in 2004 or 2005 (Tr. at 255).  Plaintiff
had testing done but her doctor was unable to find a surgeon who
accepts Medicaid (Tr. at 255).

Plaintiff has trouble grasping, turning and twisting with
her hands, and holding onto things (Tr. at 255).  Her hands
tingle, and her hands and wrists go to sleep easily (Tr. at 256).
Plaintiff has trouble writing because it is difficult to grasp
the pen security (Tr. at 256).  She cannot write for more than
five or ten minutes or her hand will cramp up or start to tingle
and hurt (Tr. at 256).  Plaintiff's kids will sometimes have to
remove lids, help her pick something up off the floor, or do
zipping and buttoning (Tr. at 257).

Plaintiff has a computer, but she uses it very little (Tr.
at 257).  She can only use the keyboard for about ten minutes,
and then her hands begin cramping and hurting (Tr. at 257).  If
she uses her mouse, she can work on her computer for another ten
to 15 minutes (Tr. at 258).

Plaintiff has daily headaches which often turn into
migraines which are incapacitating (Tr. at 258).  She gets
migraines about once a week (Tr. at 258).  Plaintiff has to lie
down in a dark room with a cool cloth on her head (Tr. at 258).
Her migraines last from six hours to all day (Tr. at 258).  She
has had this type of migraine for the past three or four years

27

(Tr. at 258-259). She had migraines in 2002 when she worked for National United Properties, but they were not as frequent (Tr. at 259). Plaintiff has tried two different medications for migraines (Tr. at 259). Neither has worked very well, but she must work within the confines of Medicaid (Tr. at 259).

Plaintiff was diagnosed with chronic fatigue in 2003 or 2004 (Tr. at 260). The symptoms which led plaintiff to seek medical treatment were constant fatigue, lack of concentration, poor memory, anxiety attacks, weakness, shaking, achiness in her joints and muscles (Tr. at 260). She was diagnosed with chronic fatigue with possible fibromyalgia (Tr. at 260). There is no treatment for plaintiff's condition (Tr. at 260).

Plaintiff drives her kids to school each day, and it is a half an hour each way (Tr. at 261). Sometimes plaintiff calls her parents to see if they can drive her kids to school, like on days when she feels too dizzy to get behind the wheel of her car (Tr. at 262). After taking her kids to school, plaintiff returns home and sleeps until between noon and 2:00 p.m. (Tr. at 263). When she gets up, she makes phone calls, does the dishes, does laundry, does whatever needs to be done around the house, does paperwork associated with Medicaid, sweeps the floors, makes sure the beds are changed, prepares meals, lets the dog out, feeds the dog, bathes the dog once a week (Tr. at 263-264). She often has

28

to sit down to rest or lie down to sleep between performing her household duties (Tr. at 263). Plaintiff described her dog as a "strong dog" who "takes a lot of energy to wash" (Tr. at 264).

Plaintiff picks her kids up at 3:30 and at 4:30 (Tr. at 265). Once they are home, she makes sure they do their homework, pick up their room, walk the dog, and help plaintiff with supper (Tr. at 265). Plaintiff puts her kids to bed at 7:00, and then she watches television, showers, prepares her daughter's lunch for the next day, irons, and spends time with her husband (Tr. at 266). Although plaintiff is ready for bed at 8:00 or 8:30, she does not get to bed until 9:30 or 10:00 (Tr. at 266).

Plaintiff takes medication for her dizziness but it does not completely take care of it (Tr. at 267). She has to touch the wall or other things to make sure she is still upright (Tr. at 267). Plaintiff's dizziness began in about 2004 (Tr. at 268). Her anxiety began in about 2001 to 2002 (Tr. at 268). She was diagnosed with anxiety and prescribed Xanax in 2003 (Tr. at 268). When plaintiff has anxiety, her heart pounds, her concentration is worse, she feels nervous, and although she can see people's mouths move she does not know what they are saying (Tr. at 269). Plaintiff gets this type of anxiety from something as simple as trying to figure out what to make for supper (Tr. at 269-270). Plaintiff's panic attacks occur when she is interacting with

29

others (Tr. at 270-271). Sometimes she has to call her parents or her husband to come get her (Tr. at 271). This happens two to four times per month (Tr. at 271).

**2. Vocational expert testimony.**

Vocational expert Janice Hastert testified at the request of the Administrative Law Judge. The first hypothetical involved a person capable of light work, occasional postural abilities, no exposure to extreme cold, no exposure to concentrated airborne irritants, no exposure to hazards or unprotected heights (Tr. at 280). The vocational expert testified that such a person could return to plaintiff's past work as a phlebotomist[15] or a medical assistant (Tr. at 280).

The ALJ amended the hypothetical to include moderate limitations in maintaining concentration for extended periods of time, i.e., performing at a C- level on an A through F grading scale (Tr. at 280). The vocational expert testified that the person could not be a phlebotomist or a medical assistant because those jobs require a fairly high degree of accuracy in the reporting of information and data (Tr. at 280). The person could, however, be a photocopy machine operator, with 100 such jobs in Kansas City, 200 in Missouri, and 11,000 in the nation (Tr. at 280). The person could also be an arcade attendant, with

---

[15]One who specializes in drawing blood.

125 such jobs in Kansas City, 400 in Missouri, and 51,000 in the
nation (Tr. at 281). The person could be a messenger, with 900
in the Kansas City area, 1,600 in Missouri, and 80,000 in the
country (Tr. at 281). All of these jobs are light, SVP2 (Tr. at
281).

The person could also do sedentary work such an information
clerk, with 120 in Kansas City, 160 in Missouri, and 10,000 in
the nation (Tr. at 281). She could be a production checker with
200 in Kansas City, 700 in Missouri, and 32,000 in the country
(Tr. at 281).

The vocational expert testified that if the person were
incapable of repetitive, rapid, hard grasping, she could still
perform all of those jobs (Tr. at 281).

The next hypothetical involved a person who could attend to
task for segments of 30 to 45 minutes at a time and then would
have to either lie down or leave the task for an hour or two at a
time due to a severely limited ability to concentrate and attend
to task (Tr. at 281-282). The vocational expert testified that
such a person could perform no work (Tr. at 282, 283).

The next hypothetical involved a person who could only very
infrequently grasp or turn or use fine grasping or gross
manipulation with both hands (Tr. at 282). The vocational expert
testified that the person could still perform the information

31

clerk job, the messenger job, and possibly the production checker job and the photo copier job (Tr. at 282-283).

The next hypothetical involved a person who, because of migraine headaches, would be absent three to four times per month (Tr. at 283). The vocational expert testified that the person could not perform any work (Tr. at 283).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge George M. Bock entered his opinion on March 24, 2006.

Step one:  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 15).  Plaintiff's work as a self-employed housekeeper was short-lived and her earnings were not at a level presumptive of substantial gainful activity (Tr. at 15).

Step two:  Plaintiff has the following severe impairments: mood disorder, anxiety disorder, carpal tunnel syndrome, migraines, and chronic fatigue (Tr. at 16).  Plaintiff's Epstein Barr Syndrome is not severe; her gallstones are not severe (Tr. at 16).  Her alleged dizziness is not a medically determinable impairment as it is not clearly documented or assessed in the record (Tr. at 16).

Step three:  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 16)

32

Step four:  Plaintiff retains the residual functional
capacity to perform work at the light exertional level and can
perform all postural activities occasionally (Tr. at 17).  She
should avoid exposure to extreme cold, avoid concentrated
exposure to airborne irritants, she should avoid hazards like
unprotected heights (Tr. at 17-18).  Plaintiff's mental condition
causes no limitations in her activities of daily living; no
difficulties in maintaining social functioning; moderate
difficulties in maintaining concentration, persistence, or pace;
and is not expected to cause episodes of deterioration or
decompensation (Tr. at 18).  As a result of this mental
condition, plaintiff has moderate limitations in her ability to
maintain concentration for extended periods.  Finally, she cannot
perform repetitive rapid hard grasping (Tr. at 18).

With this residual functional capacity, plaintiff is unable
to return to any of her past relevant work.

Step five:  Plaintiff is able to perform the light jobs of
photocopy machine operator, arcade attendant, and messenger, as
well as the sedentary jobs of information clerk and messenger
(Tr. at 18).  Those jobs exist in significant numbers in the
national and regional economies (Tr. at 18-19).

Therefore, plaintiff was found not disabled at the fifth
step of the sequential analysis.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations

34

by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> Follow-up examinations conducted during this period showed the claimant to have few objectively based physical impairments. She, however, continued to make various subjective complaints related to dizziness, daily headache pain, and impaired memory. She also reported being depressed and fatigued. Secondary to her complaints, the claimant underwent further examinations. The etiology of the claimant's alleged dizziness and impaired memory were described as "unclear". . . .
>
> . . . The objective medical evidence and clinical findings, however, do not support the severity of limitation alleged by the claimant. Examinations of the claimant have shown few objectively based problems and have often been incongruent with the claimant's subjective complaints. Furthermore, the claimant's current complaints are incongruent with her treatment history as well as her longitudinal medical history. It has been only recently, after filing for benefits, that the claimant has begun to make many of her current claims about mental and physical limitation. The undersigned finds the timing of these complaints to be suspicious.

35

The medical record also reflects the claimant's condition, especially her mental condition, has been helped with medication. In her most recent examination with Dr. Vineyard, the claimant's mental condition appeared relatively stable and Dr. Vineyard did not refer the claimant to a mental health provider. The claimant was pleasant and cheerful during the hearing. She was also alert and very articulate. In addition, the claimant testified she could control her anxiety and that her episodes of anxiety never got to the point that she could not function, which contradicted other claims in which she alleged her anxiety was out of control.

The claimant's assertions of disability are further undermined by her activities of daily living. The claimant attempted to downplay her abilities during the hearing; however, the claimant has two minor children, who[m] she cares for daily. Her duties included taking them to school every day as well as providing for their daily needs. She also is able [to] take care of her personal needs, perform all the household chores, and take care of a dog. Additionally, the claimant is able to drive an automobile daily and donate plasma twice a week. Overall, the claimant is active on a daily basis taking care of her two children and living her daily life. Considering these circumstances and the overall record, the claimant is found not fully credibly. She has limitations, but they are not as severe as alleged.

(Tr. at 15, 17).

## 1. PRIOR WORK RECORD

Plaintiff has a steady work record until her alleged onset date. This factor supports her credibility.

## 2. DAILY ACTIVITIES

Plaintiff is able to get her kids dressed, give them baths, fix their meals, help them with homework, put them to bed, do the laundry, clean the house, do dishes, pay bills, make the beds, change sheets, iron, vacuum, sweep, take out the trash, read and

36

watch television, check her e-mail, read stories to her kids, do crafts, drive an hour round trip every day to take her kids to school and then do the same in the afternoon to pick them up, clean and treat her entire house for lice, do paperwork associated with Medicaid, and bathe her "strong" dog who "takes a lot of energy to wash." As the ALJ pointed out, these daily activities are inconsistent with plaintiff's allegations of disabling pain and fatigue.

**3.  *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS***

The only time plaintiff's GAF was assessed, it was 64, which means mild symptoms. Her highest GAF in the last year was assessed at 77, which means essentially normal. When plaintiff was seen at Truman Medical Center Behavioral Health, her speech was normal, her thought processes were intact, her judgment was intact, her attitude was cooperative, she had no disturbance of her thought content, her motor activity was normal, her mood was normal, her insight was good, her alertness was good, her affect was appropriate, her intellect was above average, and her memory was intact. It was recommended that plaintiff get counseling so that she could return to employment; however, there are no records of any counseling.

Her Mental Status Exam in January 2004 showed no difficulty interacting with the consultant; her affective responses were

Case 4:06-cv-00746-REL   Document 15   Filed 06/15/07   Page 37 of 47

appropriate; her speech was clear, logical and coherent.  Mr.
Keough found that plaintiff "had some difficulty remembering
things"; however, he did not indicate what things she had
difficulty remembering.  As all of her tests were normal,
apparently he relied solely on her subjective complaints of poor
memory to support this finding.  He even remarked that she
generally remembered in an adequate manner.  In fact, he recited
all of the memory tests conducted, and plaintiff performed
adequately on all of them.  Plaintiff's social judgment skills
were adequate, she had insight into her problems, her quality of
thinking was adequate, and her conceptual thinking was adequate.
Plaintiff reported no changes in her interests or habits over the
past year.

On October 28, 2003, plaintiff told her doctor that she was
not on any medications; however, she had been prescribed an
antidepressant just three weeks earlier.  The implication is that
plaintiff's symptoms were not bad enough for her to fill that
prescription.

In April 2005, Dr. Vinyard assessed depression, anxiety, and
fatigue, and told plaintiff to eat three times a day, which is
clearly conservative treatment indicating Dr. Vinyard did not
believe these symptoms were severe.

Case 4:06-cv-00746-REL   Document 15   Filed 06/15/07   Page 38 of 47

The evidence in the record on this factor supports the ALJ's credibility assessment.

## 4. *PRECIPITATING AND AGGRAVATING FACTORS*

There really are no observations in the record by treating physicians or third parties of precipitating or aggravating factors.

## 5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

Plaintiff's first visit to a medical specialist for mental symptoms was in October 2002, and it was recommended that she participate in counseling. She was prescribed no medication for her symptoms. In October 2003, plaintiff reported tension headaches which were relieved by over-the-counter Excedrin. In January 2004, plaintiff's medications consisted of Ibuprofen, an herb, birth control pills, 1 mg. of Xanax as needed, and Elavil, and antidepressant.

In September 2005, plaintiff told her doctor that she had not filled her Lexapro prescription for several months. Lexapro treats anxiety and depression, and plaintiff's failure to take her prescription as directed indicates her symptoms were not as severe as she alleges.

The record establishes that plaintiff has never been on strong medication for any of her symptoms, and that plaintiff has gone lengthy periods without taking the medication that had been

Case 4:06-cv-00746-REL   Document 15   Filed 06/15/07   Page 39 of 47

prescribed for her.  This factor supports the ALJ's credibility determination.

### 6.   *FUNCTIONAL RESTRICTIONS*

In her claimant questionnaire completed in November 2003, plaintiff reported that she can use her hands for 15 to 30 minutes before her arms and shoulders feel weak and shaky.  She never reported these symptoms to any treating doctor.

In December 2003, a DDS physician found that plaintiff can lift 20 pounds occasionally and ten pounds frequently; can stand and/or walk for about six hours per day; can sit for about six hours per day; and has an unlimited ability to push or pull.  She found that plaintiff can occasionally climb, balance, stoop, kneel, crouch, or crawl.  She found no manipulative limitations (such as reaching and handling), no visual limitations, and no communicative limitations.  She found that plaintiff should avoid concentrated exposure to extreme cold or heat, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights.

In January 2004, Mr. Keough found that plaintiff's ability to understand and remember instructions is mildly to moderately limited by a mood disorder and anxiety; her ability to sustain concentration, persistence in tasks, and maintain and adequate pace in productive activity on a sustained basis necessary to be

Case 4:06-cv-00746-REL   Document 15   Filed 06/15/07   Page 40 of 47

gainfully employed and self-sustaining appears to be moderately limited by a mood disorder and anxiety; and her ability to adapt to the environment of others appears to be mildly to moderately limited by the above-mentioned symptoms. However, all of the tests administered by Mr. Keough were normal, and his findings of plaintiff's limitations seem to be based solely on her subjective complaints.

Plaintiff has never been restricted from any activities based on any of her symptoms. Even though she claims to suffer from severe dizziness and confusion, she drives her children to school every day which takes an hour during each trip. It is not plausible that plaintiff would put herself, her children, and others on the road in danger by driving when she believed she could "pass out".

This factor supports the ALJ's credibility analysis.

**B.    *CREDIBILITY CONCLUSION***

Plaintiff's alleged onset of disability is August 15, 2002. There are no medical records which predate her alleged onset date. The first record is dated two months later, when she was seen at Truman Medical Center. She was diagnosed with Major Depressive Disorder, moderate, single episode. The provider indicated that "her reports [of] passive suicidal thoughts and inability to maintain employment" led him to that diagnosis. Her

41

symptoms were described as mild, and she was told to get counseling.

Despite plaintiff's claims of disabling physical and mental symptoms, she had no medical records at all from October 9, 2002, through October 9, 2003 -- a full year.  She had no medical records at all from April 13, 2004, until October 15, 2004 -- more than six months.

Plaintiff reported in late 2003 that she had stopped taking her Elavil, despite alleging disabling depression and anxiety. In September 2005, she stated that she had not refilled her Lexapro for several months, even though she alleges disability due to anxiety and depression and Lexapro treats these conditions.

A physical exam performed in October 2003 resulted in everything being marked "normal" including judgment, insight, orientation, mood, affect, recent memory, and remote memory.  In December 2003, plaintiff's physical exam was normal. In February 2004, plaintiff's physical exam was normal.  In April 2004, plaintiff's physical exam was normal.

In January 2004, while meeting with a psychologist in relation to her disability claim, plaintiff said that she is up and down all night.  Yet, less than two months earlier in her claimant questionnaire she stated that she has no problem going

42

to sleep and staying asleep. Plaintiff told Mr. Keough that she had been in therapy for ten months, but there are no records indicating that plaintiff actually participated in therapy. Dr. Vinyard recommended plaintiff see a rheumatologist, but there is no evidence she did so. Dr. Vinyard recommended plaintiff see a neurologist, but there is no evidence she did so.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disability are not credible.

## VII. VOCATIONAL EXPERT'S TESTIMONY

Plaintiff argues that the vocational expert's testimony was not the result of a hypothetical question encompassing all of plaintiff's credible impairments. Specifically, plaintiff suffers from chronic fatigue, depression, mood disorder, anxiety, headaches, and carpal tunnel syndrome; however, the hypothetical included only moderate limitation in maintaining concentration for extended periods. Plaintiff points out that the agency doctor found that plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, which the ALJ failed to address.

Although the hypothetical question must set forth with reasonable precision the claimant's impairments, Starr v. Sullivan, 981 F.2d 1006, 1008 (8th Cir. 1992), it need only

43

include those impairments and limitations found credible by the ALJ. Pertuis v. Apfel, 152 F.3d 106, 1007 (8th Cir. 1998). Discredited subjective complaints are properly excluded from a hypothetical question so long as the ALJ has reason to discredit them. Fuilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005).

Carpal Tunnel Syndrome. In October 2003, an interviewer with Disability Determinations found that plaintiff had no difficulty using her hands or writing. In December 2005, Dr. Mays noted that fine movements of the hands were within normal limits. Plaintiff testified that she was able to do paperwork associate with Medicaid, sweep the floors, cook, make phone calls, do dishes, and wash the dog, all of which require her to work with her hands. Plaintiff's medical records establish that she was able to use a butcher knife while cooking. There are no allegations to any doctors establishing that plaintiff's carpal tunnel syndrome symptoms were so bad that she could not perform the jobs the vocational expert testified that she could perform. In fact, the ALJ found that plaintiff could not perform repetitive rapid hard grasping, and the hypothetical presented to the vocational expert included this limitation.

Concentration. In October 2003, an interviewer with Disability Determinations observed that plaintiff had no difficulty with understanding, coherency, or concentrating.

Plaintiff reported in her claimant questionnaire that she is able to pay bills, use a checkbook, prepare money orders, and count change. She also reported that she is able to drive an unfamiliar route.

In October 2003, Plaintiff's doctor found that her exam was normal, including judgment, insight, orientation, mood, affect, recent memory, and remote memory. In January 2004, in connection with her disability claim, plaintiff was seen by John Keough, M.A., who found that plaintiff's memory "appears to be complicated" by her alleged anxiety, a conclusion drawn despite all of her memory tests coming out normal. Plaintiff's social judgment skills were normal, her insight into problems was normal, her quality of thinking was normal, her conceptual thinking was normal.

That same month, Dr. Morrison found that plaintiff was not significantly limited in her ability to remember locations; remember work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual; sustain an ordinary routine without special supervision; work with others; make simple work-related decisions; interact appropriately with the general public; ask for assistance; accept instructions;

45

respond appropriately to criticism; get along with coworkers; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; be aware of hazards; and set realistic goals. He noted that plaintiff's Mental Status Exam was normal, and that the data suggest that plaintiff would be capable of performing adequately in a low-stress work environment.

The ALJ's hypothetical to the vocational expert included the limitation that plaintiff has moderate difficulties in maintaining concentration, persistence, or pace. Based on the records, it appears that the ALJ was giving plaintiff the benefit of any doubt in making this finding.

Fatique. The ALJ found that plaintiff suffers from "chronic fatigue" and included this in the list of her severe impairments.

Because the hypothetical relied on by the ALJ included all of plaintiff's credible impairments, plaintiff's motion for summary judgment on this basis will be denied.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

46

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 15, 2007

Case 4:06-cv-00746-REL   Document 15   Filed 06/15/07   Page 47 of 47